IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| NADINE BASRI | CIVIL ACTION |
|---|---|
| v. | NO. 19-4935 |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE | |

**MEMORANDUM RE: MOTION FOR SUMMARY JUDGMENT**

Baylson, J.                                                                                                                         December 8, 2020

**I.       Introduction**

Plaintiff Nadine Basri contends that she faced employment discrimination and retaliation stemming from her maternity leave to care for her prematurely born son. Following her leave, Basri's employer, the Trustees of the University of Pennsylvania ("Penn"), removed her from consideration for a promotion. The parties disagree as to why. Months later, she was no longer employed at Penn. Again, the parties dispute exactly why and how this happened. Simply stated, these factual disputes cut to the core of this litigation and, because genuine issues of material fact persist, the Court must DENY Penn's motion for summary judgment.

**II.      Factual Contentions by Plaintiff**

As this is a motion for summary judgment, this Court must view the record "in the light most favorable to the nonmovant, drawing reasonable inferences in its favor." See, e.g., In re Chocolate Confectionary Antitrust Litig., 801 F.3d 383, 396 (3d Cir. 2015). The parties differ in only two major respects: Penn's motivations and the timeline of Basri's termination.

1

A. <u>Early Employment at Penn</u>

Basri began working for Penn's Radiology-Oncology Department as a New Patient Coordinator on October 17, 2016. ECF 13 at ¶ 1. In Spring of 2017, Basri began reporting to Linda Mas, the Administrative Service Coordinator. <u>Id.</u> at ¶ 4. Shortly thereafter, in or around April 2017, Basri informed Mas that she was pregnant. <u>Id.</u> at ¶ 6.

Her baby was expected to be born on November 9, 2017. <u>Id.</u> at ¶ 8. During Basri's pregnancy, Penn permitted her to take any amount of time she needed to attend pregnancy-related medical appointments. ECF 15-2, Section II at ¶ 9. Basri testified that, as she prepared for her upcoming maternity leave, Mas offered her repeated assurances that she would be able to secure leave until February 1, 2018. <u>Id.</u> at ¶ 9. Penn contests this characterization and contends that February 1, 2018 was simply the date that Mas anticipated Basri's return, given Basri's expected due date and the FMLA's twelve-week leave window. ECF 17-1 at 9.

Basri performed her duties well. ECF 15-2, Section II at ¶ 2. As a result, Mas expressed to Basri that she intended to create a Team Lead position for Basri. <u>Id.</u> at ¶ 6. According to Basri, Mas would not create this new position, which may have constituted a promotion, while Basri was pregnant or about to go on leave. <u>Id.</u> Penn denies this. ECF 17-1 at ¶ 6.

In July 2017, Mas requested temporary assistance from Penn's temporary employee "float" pool to cover Basri's duties during her expected pregnancy leave. ECF 13 at ¶ 10. Around that time, Mas asked Basri to create a standard operating procedures document for her job duties, to assist with the training and onboarding of her replacement. ECF 15-2, Section II at ¶ 4; ECF 17-1 at ¶ 4. A temporary employee, Shakia Dehaney, began on September 1, 2017, with an anticipated month to train for Basri's position. ECF 15-2, Section II at ¶ 7.

B. <u>Application for Promotion and Maternity Leave</u>

On September 11, 2017, Basri applied for a new position at Penn, that of Faculty Affairs Program Coordinator ("FAPC"). ECF 15-2, Section II at ¶ 11. Rebecca Struwe, Penn's Chief of Staff and Associate Director of Strategic Planning for the department, was responsible for supervising the FAPC and for selecting the new hire for the position. ECF 13 at ¶ 16. Struwe told Basri that she was "very excited" to consider Basri's application, and Struwe wanted her to start as FAPC before going on maternity leave. ECF 15-2, Section II at ¶¶ 11, 16.

During the hiring process, Struwe narrowed the potential contenders down to two: Basri and Sallie Ellison. ECF 13 at ¶¶ 29, 30. Basri and Ellison began their final round interviews during the first week of October 2017. ECF 15-2, Section II at ¶¶ 16, 19.

Basri never completed her interviews, however, because her son was born five weeks premature on October 4, 2017. <u>Id.</u> at ¶¶ 16, 18. She began maternity leave right away, leaving both her interviews and the training protocols for her replacement incomplete. <u>Id.</u> at ¶¶ 16, 19.

On October 5, 2017, Struwe selected Ellison for the position of FAPC, <u>id.</u> at ¶ 21, citing Ellison's superior qualifications and Mas' negative reviews of Basri's performance. ECF 13 at ¶¶ 30, 31. Mas' negative reviews were exclusively related to Basri's failure to complete her training protocols. Ex. C to ECF 13-1 (Mas Dep.) at 77.

Ellison, however, withdrew from consideration. ECF 15-2, Section II at ¶ 25. Even though Basri offered to complete the interviews remotely, Struwe declined, stating that she had selected another candidate. <u>Id.</u> at ¶¶ 26–27. Instead, on October 17, 2017, Struwe created a new job posting for the FAPC position, <u>id.</u> at ¶ 28, and she eventually selected a new candidate, who had not previously been under consideration for the position. <u>Id.</u> at ¶ 29.

On December 26, 2017, Penn sent Basri a letter stating that her leave would end on January 8, 2018 and she was expected to return to work the next day. ECF 13 at ¶ 36. Basri, however, had relied on her understanding that Mas guaranteed her leave through February 1. ECF 15-2, Section II at ¶ 31. Basri had not made daycare arrangements for the month of January, and she needed additional time at home with her son, who was too unhealthy to enter general daycare at the time. Id. at ¶ 32.

On January 2, 2018, Mas emailed her supervisors that she was "praying" that Basri would not return. Id. at ¶ 34. She also stated that Basri was "out of control," "unprofessional, desperate, and honestly unstable," following Basri's attempts to extend her leave until February, as Mas believed that her behavior placed an unfair burden on the remaining staff. Id.

C.  Job Termination

Over the next few days, four key conversations took place between Basri; Mas; and Kenya Pitt, Penn's human resources representative.

- First, Basri spoke with Pitt. Ex. B to ECF 13-1 (Basri Dep.) at 259–260. In that conversation, Basri requested further information from Pitt regarding resources for extending her leave. Id. Pitt did not supply any. Id.

- Basri then spoke with Mas on January 3, 2018, telling her that she could not return on January 15 since she still needed to take care of her son. Id. at 261.

- Mas emailed Pitt later that day. Ex. 8 to ECF 15-4. Mas told Pitt that "Nadine reached out to me to let me know she won't be returning so I will terminate her in the system effective today unless you feel her termination date should be the end of the week." Id. Mas entered Basri's termination into Penn's human resources system on January 3, 2018. Ex. M to ECF 13-1; Mas Dep. at 100. Pitt responded

4

        to the email on January 4, 2018, and she told Mas to enter Basri's termination as "effective immediately." Ex. 8 to ECF 15-4.

- Basri spoke again with Pitt on January 4 or 5, 2018. Basri Dep. at 260. Basri told Pitt that she was still "talking to people" at Penn, hoping they would "find a way to work with" her regarding a return date. Id. at 261. But, when Pitt asked her if she was "coming back or not," Basri replied "I guess if there is no way to extend my leave, then not." Id. at 262–263. Basri asked if Pitt "need[ed] a letter of resignation," and Pitt replied "[N]o. You are technically being terminated for failure to return to your position — or for failure to return to work." Id. at 263.

The parties dispute the order of these discussions, with Pitt, Mas, and Basri identifying different dates during their depositions, all within the range of January 3 through 5. Notably, Penn contends that Basri's final discussion with Pitt was on January 3, 2018, before Pitt advised Mas to enter in the job termination. Ex. A to ECF 17 (Pitt Dep.) at 45–46; ECF 17-1 at ¶ 35.[1]

Following these discussions, Basri did not return to her position. ECF 15-2, Section II at ¶ 38.

      D. Post-Termination

On January 8, 2018, Basri emailed several Penn employees to notify them of her departure. ECF 13 at ¶¶ 47–49. In the emails, Basri depicted her departure as being of her own volition,

---

[1] For summary judgment, the Court will rely on the non-moving party's timeline of these communications. Russo v. United States, 576 F. Supp. 2d 662, 664 n.2 (D.N.J. 2008) ("Plaintiff's account of the [phone calls'] disputed chronology will be accepted as true for purposes of deciding Defendants' [summary judgment] motion."). See supra Section V(C)(iii) (discussing Basri's termination).

based on family needs and professional concerns.  Id.  Basri echoed these sentiments in a blog post she wrote and published on February 1, 2018.  Id. at ¶¶ 50–51.

Basri also testified, however, that she did not feel that she had a choice in her termination.  ECF 15-2, Section II at ¶ 38.  She considered her termination to be a forced decision to "either go against [her] better judgment in terms of what was best for [her] son medically . . . and . . . keeping [her] job."  Id.

### III.    Procedural History

Basri initiated a charge of discrimination with the United States Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission on July 9, 2018, within 180 days of her termination.  The EEOC sent her a Notice of Right to Sue on July 31, 2019.

Basri filed her initial complaint against Penn on October 22, 2019.  ECF 1.  After discovery, Penn moved for summary judgment on August 17, 2020.  ECF 13.  Basri responded in opposition on September 14, 2020, ECF 15, and Penn replied on September 30, 2020, ECF 17.

### IV.    Legal Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

A party seeking summary judgment "bears the initial burden of demonstrating the absence of any genuine issue of material fact."  Huang v. BP Amoco Corp., 271 F.3d 560, 564 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  The moving party can satisfy

this burden by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325. After the moving party has met its initial burden, the adverse party's response must set out specific facts, and not mere allegations, showing a genuine issue for trial by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). "[T]he non-moving party must make a showing sufficient to establish the existence of each element of his case on which he will bear the burden of proof at trial." Huang, 271 F.3d at 564.

Under Rule 56, this Court must view the evidence presented on the motion in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

**V.    Discussion**

Basri sued Penn under four counts of discrimination and/or retaliation:

    I.    Gender discrimination and retaliation under Title VII of Civil Rights Act;

    II.    Pregnancy discrimination and retaliation under Title VII of Civil Rights Act;

    III.    Gender and Pregnancy discrimination and retaliation under Philadelphia Fair Practices Ordinance ("PFPO," Phila. Code § 9-1101 et seq); and

    IV.    Retaliation under Family Medical Leave Act ("FMLA").

Basri's claims each center on two events: the denial of her promotion and her job termination. She contends that unlawful discrimination and retaliation harmed her in both events.

    A.  Relevant Legal Frameworks

        i.    Discrimination

To demonstrate a discrimination claim, Basri must satisfy the McDonnell Douglas burden-shifting framework, which applies equally to her claims of gender and pregnancy discrimination. Doe v. C.A.R.S. Protections Plus, Inc., 527 F.3d 358, 364–65 (3d Cir. 2008); see also Ahern v.

EResearch Tech., Inc., 183 F. Supp. 3d 663, 669 (E.D. Pa. 2016) (Jones, J.) (same framework for discrimination claims under PFPO).

First, a prima facie finding of discrimination requires that Basri show: (1) Penn knew she was pregnant, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) that adverse action had a nexus with the protected status. C.A.R.S., 527 F.3d at 364–65.[2]

Basri has satisfied her prima facie burden. Therefore, Penn must "articulate some legitimate, nondiscriminatory reason for the adverse employment action." Id. at 369–70. If Penn does so, Basri would need to show "a genuine issue of material fact as to whether [the employer's] proffered reasons for [the adverse action] were a pretext" for discrimination. Id. at 371.

    ii.    Retaliation

The standard for demonstrating gender and pregnancy retaliation is similar to that of discrimination. Prima facie gender or pregnancy retaliation requires the plaintiff demonstrate that "(1) [she] engaged in a protected activity; (2) [her employer] took adverse action against her; and (3) a causal link exists between the protected activity and the adverse action." Anderson v. Boeing Co., 694 F. App'x 84, 88 (3d Cir. 2017) (citing Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006)). An employee requesting leave under the FMLA for care of her newborn satisfies the first prong of this test. See 29 U.S.C.A. § 2612; Lepore v. Lanvision Sys., Inc., 113 F. App'x 449,

---

[2] This standard applies equally to gender- and pregnancy-related claims, since Basri offers a pregnancy-based theory of discrimination for both. See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C., 462 U.S. 669, 684 (1983) ("[F]or all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.").

453 (3d Cir. 2004) (first prong met because "she took an FMLA leave").

From there, the Court follows the same McDonnell Douglas burden-shifting standards, in which Penn may demonstrate a legitimate reason for the adverse action, and Basri may attempt to show that it is merely a pretext. Id. (claims under Title VII of Civil Rights Act); see also Ahern, 183 F. Supp. 3d at 670 (same framework for retaliation claims under PFPO); Mascioli v. Arby's Restaurant Grp., Inc., 610 F. Supp. 2d 419, 433 (W.D. Pa. 2009) (same framework for claims under FMLA).

### B. Discrimination and Retaliation in the FAPC Promotion

Basri contends that she did not get the promotion to the FAPC position due to discrimination and/or retaliation.

Basri has presented evidence that she was a leading, if not *the* leading, candidate for FAPC. She had to drop out of her interviews in the middle of the final round due to the premature birth of her son and the initiation of her maternity leave under the FMLA. Only one day after she began leave, Penn had completely ceased considering her for the position. An "unduly suggestive temporal proximity" between invocation of FMLA leave and an adverse employment action is sufficient to find a causal nexus at the summary judgment stage. See, e.g., Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012)) (finding nexus for plaintiff fired seven days after beginning leave). Basri has satisfied her prima facie burden for both discrimination and retaliation claims for her non-promotion.

Penn responded with two purportedly legitimate reasons for not hiring Basri as FAPC: the other candidate's superior qualifications and Basri's negative performance reviews from Mas.

9

i. Ellison's Qualifications

Ellison's superior qualifications do not provide a justification for Basri not receiving the promotion as a matter of law. By all accounts, Basri and Ellison were the two finalists for the position until Basri had to take leave in the middle of the interview process. Penn offered the position to Ellison, who declined, preferring to stay at her existing job. Instead of offering the position to Basri, the first remaining choice, Penn re-posted the job. A jury may find this argument pretextual.

ii. Basri's Negative Reviews

Basri can demonstrate that Mas' "negative reviews" were merely a pretext for discrimination and/or retaliation. Basri has provided evidence that she was generally successful in her position, and Mas conceded that she was interested in promoting Basri to a Team Lead position before her pregnancy. In Mas' deposition, in fact, she conceded that her negative review of Basri was limited to Basri's failure to complete training documents for her replacement. But Mas could hardly have expected Basri to plan on having her child five weeks early — five weeks she otherwise would have had to complete her training documents.

A jury may find Mas' behavior was motivated by discriminatory intent. Mas previously had supported Basri's aspirations until Basri's pregnancy leave, and then Mas began encouraging Struwe to stop considering Basri for the promotion. Furthermore, Mas also stated that she would have offered a Team Lead position to Basri but for her pregnancy, and her later email criticizing Basri for requesting additional leave may indicate strong resentment for Basri stemming from her use of maternity leave.

C. Discrimination and Retaliation in Job Termination

Penn challenges Basri's claims related to her termination under only one basis: that Basri

10

voluntarily resigned and, therefore, there is no qualified "adverse action" for either discrimination or retaliation claims. Basri argues either that Penn fired her before she could resign or, in the alternative, Penn forced her to quit. In the latter "constructive discharge" theory, Penn cannot claim that there was no qualifying adverse action. Larochelle v. Wilmac Corp., 210 F. Supp. 3d 658, 705 (E.D. Pa. 2016) ("Unless there is a claim for 'constructive discharge,' an employee's voluntary resignation does not constitute an adverse employment action.") (Stengel, J.) (citation omitted).

The Court agrees that Basri has raised genuine disputes sufficient to survive summary judgment on either theory.

### iii. Actual Discharge

Penn argues that Basri voluntarily resigned her position on her own and, therefore, it is not responsible for any adverse employment action in connection to her termination. Whether Basri resigned or Penn terminated her is a highly fact-specific question that prevents summary judgment.

Where "there is a genuine issue of fact as to whether plaintiff quit her job or was terminated," summary judgment is not the proper means of disposing of the claim. See Cronin v. Martindale Andres & Co., 159 F. Supp. 2d 1, 8 (E.D. Pa. 2001) (Robreno, J.) (denying summary judgment where plaintiff refused to return to work on time but "attempted to negotiate" means of accommodating longer leave); cf. Burton v. Teleflex Inc., 707 F.3d 417, 431 (3d Cir. 2013) (vacating grant of summary judgment on contract claim where "a dispute of material fact exists as to whether [plaintiff] resigned or was terminated").

Considering summary judgment, where "[t]he evidentiary record contains some conflict" regarding whether the plaintiff "expressed an intention to 'quit,'" the court "must proceed on the assumption that [the plaintiff] did not express an intention to resign." Howard v. Blalock Elec.

11

Serv., Inc., 742 F. Supp. 2d 681, 697–98 (W.D. Pa. 2010). The Court does so here due to a genuine dispute as to whether Basri or Penn was the first to terminate her employment or, indeed, whether Basri even expressed a final interest in resigning before Penn fired her.[3]

### iv. Constructive Discharge

In the alternative, Basri argues that Penn terminated her employment through "constructive discharge." Constructive discharge holds an employer legally responsible for terminating an employee if she quits because "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (citation omitted).

Penn responds that Basri's complaint never provided notice of reliance on this theory and, therefore, she cannot rely on it at the summary judgment stage. But Basri did provide sufficient allegations to provide notice of reliance on this theory; its elements are clear on the allegations' face. She alleged that her employer knowingly, and based on discriminatory and/or retaliatory intent, refused to give her leave that she needed to provide vital care for her newborn. ECF 1 at ¶ 36. As a result, she "could not return to her position" on the date that Penn demanded. Id. at ¶ 37. Penn had sufficient notice that Basri could rely on these facts to assert the theory of constructive discharge. Compare Braden v. Cnty. of Washington, 749 F. Supp. 2d 299, 303–04 (W.D. Pa. 2010) (refusing to permit plaintiff to rely on previously unstated theory for FMLA

---

[3] While Basri's emails and blog post may provide evidence at trial of an intent to quit, these documents cannot override the disputes at this stage.

liability at summary judgment stage because the "complaint simply does not assert any facts that could reasonably be construed" as raising that theory).

The Court will permit Basri to continue her discrimination and retaliation claims based on a theory of constructive termination, because many of the key facts underlying these claims remain disputed.

Based on the genuine issues of dispute under both actual and constructive discharge theories, the Court DENIES Penn's motion for summary judgment on Basri's claims regarding her job termination.

## VI.     Conclusion

For the reasons given above, the Court DENIES Penn's motion for summary judgment. An appropriate order follows.

O:\CIVIL 19\19-4935 Basri v Trustees of Univ of Penn\19cv4935 Memo re MSJ.docx